Amelia S. LONG, as personal representative of Lewis D. Long

v.

DISTRICT OF COLUMBIA, et al.

Potomac Electric Power Company, Appellant.

Amelia S. LONG, as personal representative of Lewis D. Long

v.

DISTRICT OF COLUMBIA, Appellant,

Potomac Electric Power Company, et al.

Nos. 86–5200, 86–5201.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 18, 1986.

Decided June 5, 1987.

See also, D.C., 110 F.R.D. 1.

Patrick Kavanaugh, with whom Stephen A. Trimble, Washington, D.C., was on the brief for appellant, PEPCO.

Edward E. Schwab, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief for appellant, District of Columbia.

Norman H. Singer, Washington, D.C., for appellee.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and GESELL,* District Judge.

Opinion for the Court filed by Circuit Judge MIKVA.

Opinion concurring in part and dissenting in part filed by District Judge GESELL.

MIKVA, Circuit Judge:

This case arises from an automobile accident occurring at an intersection whose traffic signals were nonfunctional. Amelia Long, the widow and personal representative of an automobile passenger killed in the accident, brought a wrongful death action against the District of Columbia and the Potomac Electric Power Company (PEPCO). A jury returned a verdict in favor of Long and against each of the two defendants, and the court entered judgment on the verdict. After the court had denied their post-judgment motions, PEPCO and the District appealed. The District contends that the trial court lacked subject

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

matter jurisdiction over Long's claim that the District was liable for her husband's death. PEPCO claims that substantive tort law principles entitle it to a judgment notwithstanding the verdict or, at a minimum, to a new trial. We agree with the District's jurisdictional argument, but disagree with PEPCO's substantive claims. We accordingly reverse the entry of judgment against the District and affirm the entry of judgment against PEPCO.

## I. BACKGROUND

The District of Columbia and PEPCO are parties to a contract concerning the maintenance of traffic signals. The parties' obligations to repair faulty traffic signals under this contract are not in dispute in this case. During weekday business hours, the District's traffic signal department is to repair all traffic signal control equipment and PEPCO is to repair all incoming cables. During evenings, weekends, and holidays, PEPCO continues to have responsibility for repairs to incoming cables and assumes primary responsibility for repairs to traffic signal control equipment. When signal control equipment malfunctions during these periods, PEPCO is to "perform temporary emergency repairs." If PEPCO is unable to repair the signal control equipment, it must notify either the District Operator or the Mayor's Command Center, which in turn must notify the District's "on-call" mechanic. The District's mechanic must then report to the intersection at which the malfunction has occurred and make the necessary repairs.

On the afternoon and evening of Saturday, July 31, 1982, PEPCO received five complaints (two of which came from the District's police department) that the traffic signals at the intersection of 13th and L Streets, N.W. were out. At 1:37 a.m. on Sunday morning, the PEPCO Control Center notified one of PEPCO's repair crews of the problem. At 3:05 a.m., the crew arrived at the intersection and began repairs. At first, the repairmen experienced difficulty in opening the door of the signal control cabinet, even though they had the proper key. Eventually, however, they gained access to the signal controls and decided to replace a fuse. After watching the lights work properly for several cycles, the repairmen closed the door of the control cabinet, whereupon the lights went dark once more. The repairment attempted, but proved unable to open the door a second time; they then notified PEPCO's dispatcher of the situation and advised him to refer the matter to the District.

The time at which PEPCO's dispatcher referred the problem to the District is in some doubt. PEPCO claimed at trial that the dispatcher had notified the District Operator on Sunday morning, at some time prior to 10:23 a.m. PEPCO, however, could not prove that it had made this call, because PEPCO's computer was nonfunctional at the time and PEPCO could not produce any handwritten records. Further, the District's on-call mechanic denied having received notice of the problem on Sunday morning. The evidence is undisputed that the police again notified PEPCO of the nonfunctioning traffic signals at 6:31 p.m. on Sunday and that PEPCO referred the complaint to the District 25 minutes later, explaining that PEPCO's repairmen had been unable to open the control cabinet. The District's Operator telephoned the District's on-call mechanic several minutes later, but the mechanic failed to report to the intersection and the lights remained completely dark.

At approximately 4:00 a.m. on Monday, August 2 an automobile accident occurred at the intersection, and Lewis Long, a passenger in one of the automobiles involved, was killed. Later that morning, the District's mechanic arrived at the intersection to fix the traffic signals. The mechanic easily opened the cabinet door and observed that the incoming cable had burned out. Although PEPCO has contractual responsibility to repair incoming cables at all times, the District's mechanic fixed the cable, and the traffic signals began to work.

Amelia Long, the widow and personal representative of the deceased, filed a wrongful death action in federal court against PEPCO and the District of Columbia. In her complaint, Long alleged that

PEPCO and the District had negligently maintained the traffic signals at the intersection and that this negligence had caused her husband's death. The complaint stated that the court had diversity jurisdiction over the claim against PEPCO because Long and PEPCO were citizens of different states. The complaint then claimed that the court had pendent party jurisdiction over the claim against the District.

The District soon filed a motion to dismiss Long's complaint on the ground that the court lacked subject matter jurisdiction. The District's motion focused on the issue of diversity of citizenship: the District essentially argued that claims against it were not amenable to diversity jurisdiction. The district court denied the motion. The court agreed that it did not have diversity jurisdiction over the claim against the District. The court stated, however, that "diversity jurisdiction in this action is established as to the plaintiff and defendant ... Potomac Electric Power Company. This court may [therefore] properly exercise pendent party jurisdiction over the District of Columbia defendants." Some time later, PEPCO filed a motion for summary judgment, arguing that substantive tort law principles precluded finding PEPCO liable for the death of Lewis Long. The district court denied this motion as well and sent the case to trial.

The jury returned a verdict in favor of the plaintiff and against the defendants PEPCO and the District in the amount of $540,000. The court entered judgment on the verdict jointly and severally against the District and PEPCO. The court also granted the crossclaims of PEPCO and the District for contribution, finding that each was entitled to contribution from the other in the amount of half of the verdict. Both the District and PEPCO filed post-judgment motions with the court. The district again sought dismissal of the complaint for lack of subject matter jurisdiction. PEPCO requested a judgment notwithstanding the verdict or, in the alternative, a new trial. The district court denied these motions, and PEPCO and the District appealed.

## II. DISCUSSION

### A. *The District of Columbia's Claim*

█ In order to decide whether the district court had subject matter jurisdiction over Long's claim against the District, we address two questions. We first consider whether diversity jurisdiction allowed the district court to hear the claim against the District. We next consider whether pendent party jurisdiction allowed the court to hear this claim. Our two-step approach to deciding the ultimate question requires some explanation. The parties in this case do not dispute the issue of diversity jurisdiction: the District contends that it is not amenable to diversity jurisdiction, and Long nowhere directly contests this point. The dearth of argument on this question suggests that we should assume, without discussing or deciding, that the district court lacked diversity jurisdiction over the claim against the District and consider only whether the court also lacked pendent party jurisdiction over the claim. Analysis of the relevant law, however, shows that we may not take this path. For reasons that will become clear in the course of this decision, we cannot sensibly discuss or decide the issue of pendent party jurisdiction in this case until we have addressed the issue of the District's amenability to diversity jurisdiction. We therefore undertake the two-step inquiry that we have outlined above.

█ We begin our consideration of whether the District of Columbia is subject to diversity jurisdiction by noting the established law regarding the capacity of states and their political subdivisions to sue and be sued in diversity. The statute conferring diversity jurisdiction provides, in relevant part, that federal district courts "shall have original jurisdiction of all civil actions where the matter in controversy ... is between ... citizens of different states." 28 U.S.C. § 1332. The Supreme Court long has held that states are not subject to diversity jurisdiction under this provision. In *Postal Telegraph Cable Co. v. Alabama,* 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231 (1894), the Court wrote:

A State is not a citizen.... [Therefore,] a suit between a State and a citizen or corporation of another State is not between citizens of different States[,] and ... the Circuit Court of the United States has no jurisdiction of it, unless it arises under the Constitution, laws or treaties of the United States.

*Id.* at 487, 15 S.Ct. at 194. The Court later extended this rule to a state's "arms or alter egos." *See State Highway Commission v. Utah Construction Co.,* 278 U.S. 194, 199, 49 S.Ct. 104, 105, 73 L.Ed. 262 (1929). The Court also has held, however, that municipalities, counties, and other political subdivisions of a state are subject to the diversity jurisdiction of the federal courts. *See Moor v. County of Alameda,* 411 U.S. 693, 718, 93 S.Ct. 1785, 1800, 36 L.Ed.2d 596 (1973); *Loeb v. Columbia Township Trustees,* 179 U.S. 472, 485–86, 21 S.Ct. 174, 179–80, 45 L.Ed. 280 (1900); *Cowles v. Mercer County,* 74 U.S. (7 Wall.) 118, 121–22, 19 L.Ed. 86 (1868). The Court has reasoned that the "independent status" of these governmental bodies dictates that they be treated as citizens of states. *Moor,* 411 U.S. at 720, 93 S.Ct. at 1801; *see id.* at 717–21, 93 S.Ct. at 1799–1802. Thus, the question we must decide is whether to treat the District like a state or like a political subdivision when a person attempts to sue the District under the diversity statute in federal court. We think we must treat the District like a state, although we reach this conclusion through analysis that differs from the analysis the District offers.

The District argues that Congress spoke directly to the question we confront by enacting subsection (d) of the diversity statute. Subsection (d) says that "[t]he word "States," as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico." 28 U.S.C. § 1332(d). The District contends that both the intent and the result of Congress's enactment of this clause was to place the District (as well as Puerto Rico and the Territories) in the same position as the fifty states with respect to amenability to diversity jurisdiction. In other words, Congress enacted subsection (d) to insulate

the District from diversity jurisdiction, and the language of the clause in fact has this effect.

We think, however, that subsection (d) alone fails to answer the question before us. Congress enacted subsection (d) to replace a similar clause added to the diversity statute eight years earlier. The sole purpose of subsection (d) was to clarify the predecessor clause. *See* Reviser's Note to 28 U.S.C. § 1332. The sole purpose of the predecessor clause was to reverse the holding of the Supreme Court in *Hepburn & Dundas v. Ellzey,* 6 U.S. (2 Cranch.) 445, 2 L.Ed. 332 (1805), that individual and corporate citizens of the District could neither sue nor be sued in diversity because they were not citizens of a "State." *See* H.R. Rep. No. 1756, 76th Cong., 1st Sess. 1 (1940); *see also National Mutual Insurance Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 583–84, 602, 69 S.Ct. 1173, 1173–74, 1183, 93 L.Ed. 1556 (1949) (discussing the purpose of the clause in the context of upholding its constitutionality). In labeling the District a "State" in subsection (d), Congress did not intend to decide the question whether the District itself is subject to diversity jurisdiction. And the subsection does not in fact decide that question. Subsection (d), when read in conjunction with other language of the diversity statute, provides that diversity jurisdiction will extend to suits between a citizen of the District and a citizen of a state. The subsection does *not* address whether suits involving the District of Columbia fall within the scope of this jurisdictional grant. The District therefore errs in thinking that subsection (d) alone answers the question whether courts should treat the District like one of the fifty states when persons attempt to sue it in diversity.

We nonetheless reach the result the District urges and hold that the District is like a state for this purpose. As we have noted, the language of the diversity statute (including subsection (d)) provides that diversity jurisdiction will extend to suits between citizens of different "States," including the District of Columbia. To bring the District within the coverage of this jurisdic-

tional grant, a court must hold that the District is a citizen of one of the statutorily defined "States." The only "State" of which the District could conceivably be a citizen is the District itself; thus, the District is subject to diversity jurisdiction only if the District is a citizen of itself. We cannot subscribe to such a bizarre characterization of the District of Columbia. As we have noted, the Supreme Court has held repeatedly that the fifty states are not citizens of themselves. *See, e.g., Postal Telegraph Cable Co.,* 155 U.S. at 487, 15 S.Ct. at 194. We can think of no reason for holding that the fifty states are not citizens of themselves, but the District is a citizen of itself. The rationale underlying the Supreme Court's teaching is that a whole cannot be a citizen of the whole. This rationale applies as well to the District of Columbia as to any of the fifty states. We therefore think the conclusion inescapable that the District, like the fifty states, is not subject to diversity jurisdiction.

A possible objection to this analysis is that the District possesses many of the characteristics of a municipality, and the Supreme Court has held that municipalities are subject to diversity jurisdiction. *See Loeb v. Columbia Township Trustees,* 179 U.S. at 486, 21 S.Ct. at 180. This holding, however, rests on the rationale that a municipality is an independent entity located in a state and therefore may be counted as its citizen. *See Moor v. County of Alameda,* 411 U.S. at 717–21, 43 S.Ct. at 1799–1802. Such a rationale is inapplicable to the District of Columbia. Even if we label the District a "municipality," that municipality is coterminous with the "State" as defined in the diversity statute: to use the Supreme Court's words, the municipality is the "alter ego" of the "State." *State Highway Commission v. Utah Construction Co.,* 278 U.S. at 199, 49 S.Ct. at 105. Given this circumstance, labeling the District a "municipality" will not avail those who wish to sue the District in diversity. Irrespective of any labels, the District is not subject to the diversity jurisdiction of the federal courts.

We turn, then, to the question whether the district court had pendent party jurisdiction in this case. Pendent party jurisdiction enables a federal court to join to a suit properly in that court certain parties as to whom no independent basis of jurisdiction exists. The lower court invoked pendent party jurisdiction to join the District to the suit between Long and PEPCO, which was properly in federal court on the basis of diversity. Analysis of this decision requires brief review of two recent Supreme Court cases relating to the proper exercise of this kind of jurisdiction.

The seminal case concerning pendent party jurisdiction is *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). In *Aldinger,* a plaintiff brought a federal civil rights action under 42 U.S.C. § 1983 in federal court against county officials and the county. She asserted federal jurisdiction under 28 U.S.C. § 1343, a special statute giving federal district courts "original jurisdiction of any civil action authorized by law to be commenced ... to redress" a § 1983 violation. The plaintiff also brought several related state law claims against the county. At that time (prior to *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)), courts believed that counties were immune from suit under § 1983, and so the district court dismissed the federal claim against the county. The court then dismissed the state law claims against the county, claiming an absence of authority to make the county a pendent party to the suit. The Supreme Court affirmed.

The Court's decision declined to lay down any "general, all-encompassing jurisdictional rule," *Aldinger,* 427 U.S. at 13, 96 S.Ct. at 2419, but provided a framework for analysis of assertions of pendent party jurisdiction. The Court held that a federal court can join to a suit properly in that court a party not otherwise subject to federal jurisdiction if Article III permits the joinder and if Congress, in the statute conferring subject matter jurisdiction over the primary claim, "has not expressly or by implication" rejected the particular use of pendent party jurisdiction. *Id.* at 18, 96 S.Ct. at 2422. Applying this framework to

the case before the Court, a majority first concluded that Article III allowed the exercise of pendent party jurisdiction because the federal claim (*i.e.*, the claim as to which there was an independent basis for federal jurisdiction) and the nonfederal claim (*i.e.*, the claim as to which there was no independent basis for federal jurisdiction) arose from a "common nucleus of operative fact." *Id.* at 13, 96 S.Ct. at 2420 (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). The *Aldinger* Court then held, however, that § 1343, when read in conjunction with § 1983, impliedly rejected the exercise of pendent party jurisdiction in the case. The Court reasoned:

> Parties such as counties, whom Congress *excluded* from liability in § 1983, and therefore by reference in the grant of jurisdiction under § 1343(3), can argue with a great deal of force that the scope of that "civil action" over which the district courts have been given statutory jurisdiction should not be so broadly read as to bring them *back* within that power merely because the facts also give rise to an ordinary civil action against them under state law.

*Id.*, 427 U.S. at 17, 96 S.Ct. at 2421 (emphasis in original). In other words, in enacting a jurisdictional statute that addressed and excluded certain *parties* (in this case, by reference to an underlying substantive statute), Congress impliedly rejected the exercise of pendent party jurisdiction over those parties in a suit based on the jurisdictional statute. The Court concluded by emphasizing the narrowness of its holding: "Other statutory grants and other alignments of parties and claims might call for a different result." *Id.* at 18, 96 S.Ct. at 2422. The Court indicated, for example, that when a grant of jurisdiction to a federal court is exclusive, courts should hesitate to find that Congress had intended to bar the use of pendent party jurisdiction. *Id.*

*Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), presented the Court with an opportunity to resolve a similar problem in a case involving the diversity statute. In *Owen*, the plaintiff, a citizen of Iowa, sued the defendant, a citizen of Nebraska, under the diversity statute. The defendant filed a third party claim against another citizen of Iowa under Federal Rule of Civil Procedure 14(a). The district court then granted the plaintiff's request to file an amended complaint naming the (nondiverse) third party as an additional defendant. On appeal, the Eighth Circuit affirmed the district court's decision, but the Supreme Court reversed.

Although *Owen* technically involved ancillary rather than pendent party jurisdiction because the defendant had brought the third party into the suit, the Court minimized the distinction between the two kinds of jurisdiction and applied the *Aldinger* analysis. The Court first assumed without deciding that the exercise of jurisdiction fell within the constitutional limits of federal judicial power. *See id.* at 371 & n. 10, 98 S.Ct. at 2401 & n. 10. The Court then turned to examine whether the statute conferring jurisdiction over the federal claim (in this case, the diversity statute) " 'expressly or by implication negated' the exercise of jurisdiction over the particular nonfederal claim." *Id.* at 373, 98 S.Ct. at 2402 (quoting *Aldinger*, 427 U.S. at 18, 96 S.Ct. at 2422). As in *Aldinger*, the Court held that the statute conferring jurisdiction over the federal claim impliedly rejected the exercise of jurisdiction over the particular nonfederal claim. The Court reasoned that the diversity statute incorporated "a congressional mandate that diversity jurisdiction is not to be available when any plaintiff is a citizen of the same State as any defendant." The Court continued:

> Thus it is clear that the [plaintiff] could not originally have brought suit in federal court [under the diversity statute] naming [the defendant] and [the third party] as codefendants. Yet the identical lawsuit resulted when she amended her complaint.... In either situation, in the plain language of the statute, the "matter in controversy" could not be "between ... citizens of different states."

*Id.*, 437 U.S. at 374, 98 S.Ct. at 2403. The Court thus concluded that in suits brought under the diversity statute, federal courts

lack jurisdiction to hear a plaintiff's claims against a citizen of the same state.

Long argues that *Owen* does not control this case. She concedes that *Owen* prohibits the exercise of pendent party jurisdiction to hear a claim against a citizen of the same state as the plaintiff in a suit based on diversity of citizenship. She contends, however, that *Owen* does not bar the exercise of pendent party jurisdiction to hear a claim against a "stateless" entity, like the District of Columbia, in such a suit. Long cites several decisions of district courts supporting her view. *See Parker v. District of Columbia*, 515 F.Supp. 10, 11 (D.D.C.1981); *United Pacific Insurance Co. v. Capital Development Board*, 482 F.Supp. 541, 545–46 (N.D.Ill.1979). In addition, Long points to a panel decision of this court, which the en banc court later vacated in relevant part. *See Rieser v. District of Columbia*, 563 F.2d 462, *vacated and reinstated in part*, 580 F.2d 647 (1978) (en banc). Although Long concedes, as she must, that this panel decision does not bind us, she contends that it remains "[t]he only evidence of this Circuit's view of pendent party jurisdiction in a diversity case" and a correct statement of the law. All of these decisions, as Long claims, take the position that a court may exercise pendent party jurisdiction over a claim against a stateless entity in a suit based on diversity because Congress neither explicitly nor implicitly has rejected the use of pendent party jurisdiction in such a case.

 We cannot accept this view. We think *Owen* stands for the general proposition that Congress, in enacting the diversity statute, impliedly rejected the use of ancillary or pendent party jurisdiction in a suit based on diversity to hear a plaintiff's claim against a party whom the plaintiff could not initially have sued in diversity. *Owen*, of course, speaks in somewhat narrower terms: because of the factual pattern of the case, the Court explicitly considered only the question whether the lower court had jurisdiction over a claim against a party who was a citizen of the same state as the plaintiff. But the rationale of *Owen* applies as well to a case in which the plaintiff wishes to bring a claim against a "stateless" party. The *Owen* Court reasoned that Congress limited diversity jurisdiction to "matter[s] in controversy ... between ... citizens of different states" and that the use of pendent party or ancillary jurisdiction in a suit based on diversity to hear a plaintiff's claim against a citizen of the same state would flout Congress's intent. We think that the use of pendent party jurisdiction in a suit based on diversity to hear a plaintiff's claim against a "stateless" party would flout Congress's intent no less; this claim, too, would not constitute a "matter in controversy ... between ... citizens of different states." We thus return to our prior holding that the District of Columbia is not a citizen of a state under the diversity statute—that the District is indeed a "stateless" entity. This holding compels the conclusion not only that the District is not subject to diversity jurisdiction, but also that the District is not subject to pendent party jurisdiction in a case based on diversity. Courts that have ruled otherwise, in our view, have erred. The diversity statute, by speaking directly to the kinds of parties who can use it to enter federal court, impliedly prohibits courts from exercising pendent party jurisdiction to hear claims against persons or entities falling outside of the statute's scope in suits based on diversity.

 We finally address in this part of our decision whether we must dismiss Long's entire suit because of the jurisdictional defect in her complaint or, alternatively, whether we may remedy this defect by dismissing only her claim against the District. Federal Rule of Civil Procedure 21 enables district courts to follow the latter route: so long as the nondiverse party is not indispensable to the action, a district court may dismiss only the claim against this party and retain jurisdiction over the rest of the case. *See* 7 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d § 1685 (1986). District courts may drop nondiverse parties in this manner at any stage of the litigation—even after trial and the entry of judgment. *See Publicker Industries, Inc. v. Roman Ce-*

*ramics Corp.,* 603 F.2d 1065, 1069 (3d Cir. 1979). Although Rule 21, like all of the Federal Rules of Civil Procedure, technically applies only at the district court level, many appellate courts have claimed for themselves the powers stemming from the Rule. *See, e.g., Mullaney v. Anderson,* 342 U.S. 415, 417, 72 S.Ct. 428, 429, 96 L.Ed. 458 (1952); *Reed v. Robilio,* 376 F.2d 392, 394 (6th Cir.1967). We therefore think we have the authority, given that all parties concede that the District is not an indispensable party, to respond to the jurisdictional defect in Long's complaint by dismissing only Long's claim against the District and retaining jurisdiction over her claim against PEPCO.

■ We choose to exercise this authority given the circumstances of this case. The jurisdictional error that occurred in this suit did not prejudice PEPCO; indeed, even PEPCO has not argued that the error caused it harm. Had the district court dismissed Long's claim against the District, her suit would have proceeded against PEPCO. There is no reason to think that the jury, which found PEPCO liable in the actual suit, would have taken a different view of PEPCO's liability in such a case. We agree with our dissenting colleague that PEPCO could have impleaded the District in such a suit to bring claims for indemnification and/or contribution. But if we were to reverse the verdict against the District and uphold the verdict against PEPCO, we would not deprive PEPCO of these claims. PEPCO could still bring suit against the District for contribution or indemnification in the District of Columbia's courts: under District of Columbia law, the statute of limitations on such claims begins to run only after a judgment has been paid. *See Keleket X–Ray Corp. v. United States,* 275 F.2d 167, 169 (D.C.Cir.1960); *Bair v. Bryant,* 96 A.2d 508, 510 (D.C.Mun.App. 1953). In a separate suit for contribution or indemnification, the District of Columbia court would determine the District's responsibility for Long's accident and its consequent liability to PEPCO in precisely the manner in which the district court would have determined these questions had PEPCO impleaded the District in the original

suit. *See Jones v. Schramm,* 436 F.2d 899, 901 (D.C.Cir.1970); *United States Fidelity and Guaranty Co. v. Doctors' Hospital,* 265 A.2d 774, 775 (D.C.1970); *Early Settlers' Insurance Co. v. Schweid,* 221 A.2d 920, 922–23 (D.C.1966). The jurisdictional error that occurred in this case thus had no prejudicial effect on PEPCO's liability or rights. Given the absence of such prejudice, we can see no reason to respond to the jurisdictional error by throwing out Long's entire suit and erasing nearly four years of litigation. "Judicial economy, convenience and fairness to litigants," *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139, all counsel the opposite course.

### B. *PEPCO's Claims*

PEPCO offers two arguments in support of its request for a judgment notwithstanding the verdict. First, PEPCO claims that it owes no duty to members of the travelling public to maintain traffic signals in accordance with the terms of its contract with the District. Second, PEPCO asserts that even assuming it owes such a duty to members of the public, no PEPCO employee breached the duty in this case. In addition, PEPCO urges that it is entitled at least to a new trial because the district court failed to give an essential instruction to the jury.

PEPCO's primary argument focuses on the scope of the utility's duty to members of the public. As we have noted, PEPCO is under contract with the District to provide certain services relating to the maintenance of traffic lights. PEPCO argues that it owes a duty to the District to perform these services, but owes no such duty to members of the public. Thus, PEPCO claims that if it fails to maintain traffic lights as provided in the contract and this failure causes harm to an automobile passenger, the District can successfully sue PEPCO for breach of contract, but the passenger cannot successfully sue PEPCO in tort. In making this argument, PEPCO relies primarily on *H.R. Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, 159 N.E. 896 (1928), a well-known decision written by Justice (then Judge) Cardozo. Con-

fronting similar facts to those in the case at bar, Cardozo rejected the notion that a contractual commitment could create a duty to the general public in tort. PEPCO argues that the District of Columbia has adopted the *Moch* rule and cites *Morgan v. District of Columbia*, 468 A.2d 1306 (D.C. App.1983), and *Warren v. District of Columbia*, 444 A.2d 1 (D.C.App.1981), in support of this claim.

In fact, the District of Columbia's local courts have taken no position on the issue presented in *Moch* and the case at bar. *Morgan* and *Warren* do quote a passage from the *Moch* decision:

An intention to assume an obligation of indefinite extension to every member of the public is seen to be the more improbable when we recall the crushing burden that the obligation would impose.... A promisor will not be deemed to have had in mind the assumption of a risk so overwhelming for any trivial reward.

*Moch*, 247 N.Y. at 165–66, 159 N.E. 896 (*quoted in Morgan*, 468 A.2d at 1313; *Warren*, 444 A.2d at 7). Each decision quoted this language, however, in a context very different from the context involved in *Moch* and the case at bar. *Morgan* and *Warren* each involved à private citizen's claim against the District for failure to provide adequate police services. The decisions rejected these claims on the primary ground that any other result would place police officials "in the position of insuring the personal safety of every member of the community, notwithstanding limited resources and the inescapable choices of allocation that must be made." *Morgan*, 468 A.2d at 1311; *see Warren*, 444 A.2d at 4. The question in this case (and in *Moch* itself) is very different. No one contests that the District has a duty to the public, enforceable in tort, to maintain streets in safe condition, *see District of Columbia v. Woodbury*, 136 U.S. 450, 10 S.Ct. 990, 34 L.Ed. 472 (1890); the question is whether a public utility, by contracting with the District to perform services integral to this duty, assumes a duty to the public to perform the contractual commitment with reasonable care. The use of language from *Moch* in *Morgan* and *Warren* cannot sensi-

bly be thought to indicate the view of the District's courts on this question. And we can find no other cases decided by the District's courts that evince any such view.

■ A decision of this circuit, however, clearly rejected the *Moch* approach in a case very similar to the case at bar. In *Caldwell v. Bechtel, Inc.*, 631 F.2d 989 (D.C.Cir.1980), a subway system worker who had contracted silicosis as a result of the high dust level in the subway tunnels sued an engineering firm (Bechtel) that had contracted with the Washington Metropolitan Area Transit Authority (WMATA) to provide "safety engineering services." We stated that the issue in the case was whether the "engineering firm owed the worker a duty to protect him against unreasonable risk of harm." *Id.* at 992. We found that the firm did owe the worker such a duty, and we designated the contract as the duty's source:

The duties that Bechtel undertook in its contract with WMATA are relevant to this case, not because they illustrate Bechtel's point that a contractual duty was owed only to WMATA, but because by assuming a contractual duty to WMATA, Bechtel placed itself in the position of assuming a duty to appellant in tort. The particular circumstances of this case, including the Bechtel-WMATA contract, Bechtel's superior skills and position, and Bechtel's resultant ability to foresee the harm that might reasonably be expected to befall appellant, created a duty in Bechtel to take reasonable steps to prevent harm to appellant from the hazardous conditions of the subway tunnels.

*Id.* at 997. In the absence of any later District of Columbia law to the contrary, this decision binds us, and we think it controls this case. Like Bechtel, PEPCO entered into a contract to perform services within its field of expertise; PEPCO thereby acquired a duty to foreseeable plaintiffs (in this case, members of the travelling public) to perform these services with reasonable care.

We note, finally, that our holding is consonant with the Restatement of Torts (Second) and with the position taken by a ma-

jority of the state courts. Section 324A of the Restatement provides that

> [o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if ... he has undertaken to perform a duty owed by the other to the third person. . . .

We think this section of the Restatement exactly describes this case. Courts in a majority of the states have adopted this section. And many of them have applied it to situations nearly identical to that which we confront. *See, e.g., David v. Broadway Maintenance Corp.*, 451 F.Supp. 877 (E.D. Pa.1978) (applying state law to find that a street light maintenance company was liable to a pedestrian for injuries caused by the company's negligent maintenance of a street light); *Fink v. Kasler Corp.*, 3 Hawaii App. 270, 649 P.2d 1173 (1982) (holding that a company that had contracted with the state to maintain stop signs owed a duty to members of the travelling public to maintain the signs with reasonable care); *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982) (affirming a jury award against a power company on the ground that the company, which had contracted with the city to install traffic lights, owed a duty to automobile passengers to do so with reasonable care). These holdings serve to confirm our view that PEPCO can be held liable to members of the public for injuries caused by its failure to perform with reasonable care the services it contracted to render.

■ PEPCO argues in the alternative that it was entitled to a judgment notwithstanding the verdict because it did not breach its contract with the District and therefore could not have breached its duty to the public. This argument reduces to the proposition that by attempting to repair the traffic signals and then referring the continuing problem to the District, PEPCO satisfied all of its obligations under the contract. We think, however, that the jury could reasonably have found otherwise and thus that entry of a judgment notwithstanding the verdict would have been inappropriate. Under the contract, PEPCO must repair faulty incoming cables at all times. In addition, PEPCO must attempt to repair faulty signal control equipment on evenings and weekends, but may refer intractable problems relating to such equipment to the District. We note as an initial matter that the District introduced uncontested evidence that when the District's on-call mechanic replaced an incoming cable, the traffic signals began to operate properly. A reasonable jury could have inferred from this evidence that the traffic signals malfunctioned because of a problem with the incoming cable, which PEPCO has full contractual responsibility to repair. Even if we ignore this evidence and assume that the lights malfunctioned because of faulty signal control equipment, we think a jury could reasonably have found against PEPCO. The jury could have found on the basis of the evidence presented that PEPCO's attempts to open the traffic signal control cabinet were insufficient. In addition, the jury could have found on the basis of this evidence that PEPCO failed to notify the District of the continuing problem with the traffic signals in timely manner. The evidence, in short, allowed a reasonable jury to find that PEPCO breached its contract with the District and thereby breached a duty owed to members of the travelling public.

■ Finally, PEPCO claims that it was entitled to a new trial because the district judge failed to give the jury any instructions relating to the duty PEPCO owed to members of the public. The judge, however, did instruct the jury as to PEPCO's duty. After setting forth the District of Columbia's duty, the district judge continued:

> [I]f any hazardous condition arises in any such traffic signal and ... persons in concert with [the District] [who] are engaged in the maintenance of that system become aware of it and fail to take reasonable steps to eliminate it, and if [you] find that that hazardous condition was a

proximate cause of an injury ... then you may find those responsible for not eliminating that condition liable to a plaintiff in damages.

We think these instructions adequately describe the duty we have found PEPCO owes to members of the travelling public to repair traffic signals. We therefore deny PEPCO's request for a new trial.

### III. CONCLUSION

For the reasons stated, we reverse the district court's decision regarding the District of Columbia's motion to dismiss, but affirm the district court's decision regarding PEPCO's motions for a judgment notwithstanding the verdict and a new trial.

*It is so ordered.*

GESELL, District Judge, Concurring in part and dissenting in part.

I am in full agreement with the majority view that the United States District Court had no diversity jurisdiction to hear this claim by a Maryland plaintiff against the District of Columbia. I would hold, however, that the judgment against PEPCO must be reversed and the case remanded for a new jury trial. To this extent only, I respectfully dissent.

It does not appear to me to be realistic to send this case to the Superior Court to resolve PEPCO's claim for contribution in a non-jury trial.

At the very outset of the case PEPCO cross-claimed against the District of Columbia. Later, after much of the discovery had been completed, it moved unsuccessfully for summary judgment against the District. When the case went to trial no judgment was entered on this cross-claim.

The District Court commented that throughout the litigation PEPCO had insisted that the proximate cause of the death was the sole negligence of the District. The District Court also recognized this issue when it noted that the District could be brought into the case to answer

PEPCO under Rule 14, in any event, if jurisdiction over the District was otherwise lacking. PEPCO pursued this claim before the jury. It cross-claimed for indemnification against the District. The indemnification claim was not presented to the jury by verdict form or otherwise.

A review of the jury instructions indicates the jury was not given any guidance to enable it to sort out the factual and legal issues underlying PEPCO's cross-claim for indemnity against the District. A new trial is required. PEPCO was entitled to a verdict on its crossclaim.

Even on the joint liability view adopted by the majority, the instructions were wholly inadequate. Regardless of whether PEPCO's duty went somewhat beyond strict compliance with the terms of its contract with the District, the nature and extent of that duty in the circumstances of this case was not defined for the jury's benefit, nor, indeed, even mentioned with any specificity. In this context the standard proximate cause instruction was not sufficient given the factual disputes over timing of key events which, under one possible version of the facts, should have completely exonerated PEPCO for lack of proof that its acts or failure to act were a proximate cause of the injury. This denied PEPCO a fair trial.[*]

Since there is no question this case was brought in the wrong court, I am unable to understand why the majority is willing to excuse plaintiff for her error and thereby cut off PEPCO's right to a full jury trial of its claim against the District. The primary liability of the District is crystal clear under the statute, reinforced by its failure promptly to use its police power when notified of the stoplight outage.

For all these reasons I would reverse and remand for a new trial so PEPCO can have a jury trial on its crossclaim against the District. If that claim fails, the District Court having brought the District into the case under Rule 14 can settle contribution

---

[*] It makes no difference that after judgment on the joint verdict was entered, the indemnity claim was necessarily mooted by the improper verdict and the District Court granted PEPCO's

claim pursuant to the verdict for contribution from the District in the amount of fifty percent of the verdict.

for whatever verdict is reached on the main claim. Accordingly, I respectfully dissent.