William **KRIEGER**, Plaintiff,

v.

The **TRANE COMPANY**, et al., Defendants.

Civ. A. No. 90–1231–LFO.

United States District Court, District of Columbia.

May 22, 1991.

John J. Boyd, Jr., Earl W. MacFarlane, Smith, Somerville & Chase, Baltimore, Md., Paul D. Murphy, Cheverly, Md., for plaintiff.

Rachel C. Evans, James A. DeVita, Asst. Corp. Counsel, Washington, D.C., for defendants Univ. of D.C. and D.C.

Leonard H. Greenebaum, Rebecca L. Jackson, Baker & Hostetler, Washington, D.C., for Trane Co.

## MEMORANDUM

OBERDORFER, District Judge.

On May 29, 1987 plaintiff William Krieger, then an employee of ABC Electric Motor Services, went to the University of the District of Columbia to replace a failed electric motor in an airhauling unit. Krieger alleges that before beginning to remove the motor, he shut off the power to the unit. He did not, however, shut off the power to the other fans in the room, and while he was removing the motor from the unit before him, the air current from one of the other, functioning units caused the fan blade to rotate, which in turn caused the unit's pulleys and belts to turn. Those pulleys and belts severed Krieger's thumb from his left hand.

In his original complaint, Krieger named as defendants the manufacturer of the airhauling unit, The Trane Company ("Trane"), the University of the District of Columbia ("UDC"), and the District of Columbia. That complaint alleged, among other things, design and manufacturing defects, failure to warn, and failure to operate the airhauling units in a safe manner. UDC and the District moved to dismiss for lack of subject matter jurisdiction. UDC contended that it was *non sui juris;* the District contended that because it is a state for purposes of 28 U.S.C. § 1332,[1] it is not subject to diversity jurisdiction. *See Long v. District of Columbia,* 820 F.2d 409, 414 (D.C.Cir.1987). Krieger did not oppose these motions. Instead, he amended his complaint, dropped the District and substituted the Board of Trustees of UDC for the university itself.

Currently before the court are motions to dismiss by the remaining defendants, the Board and Trane. A hearing on these motions was held on October 31, 1991, and supplemental briefs were submitted. Now that those briefs have been received, defendants' motions are ripe for consideration.

## I.

The Board contends that it is not subject to diversity jurisdiction because it is an alter ego or arm of the District of Columbia government. *See, e.g., Moor v. County of Alameda,* 411 U.S. 693, 717–18, 93 S.Ct. 1785, 1799–1800, 36 L.Ed.2d 596 (1973); *State Highway Comm'n v. Utah Const. Co.,* 278 U.S. 194, 199, 49 S.Ct. 104, 105–06, 73 L.Ed. 262 (1929). Krieger disputes this characterization and contends that the Board is an independent entity subject to diversity jurisdiction.

## A.

■ In order to resolve this dispute, it is first necessary to determine what it means to be an arm or alter ego of a state. This question has generally been treated in pragmatic fashion: An entity is deemed to be an arm of a state whenever the state is the real party in interest. *See, e.g., State Highway Comm'n,* 278 U.S. at 199, 49 S.Ct. at 105–06; *Northeast Federal Credit Union v. Neves,* 837 F.2d 531, 533 (1st Cir.1988); *Hughes–Bechtol, Inc. v. W. Virginia Bd. of Regents,* 737 F.2d 540, 543 (6th Cir.), *cert. denied* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984); *Tradigrain, Inc. v. Mississippi State Port Auth.,* 701 F.2d 1131, 1132–34 (5th Cir. 1983).

---

1. 28 U.S.C. § 1332 provides in relevant part: The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interests and costs, and is between—
   (1) citizens of different States;
   (2) citizens of a State and citizens or subjects of a foreign state;

(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
   (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or different States.
28 U.S.C. § 1332(a) (1988).

■ Most courts have analogized the determination of whether a state is the real party in interest for purposes of § 1332 to the determination of "whether an agency 'is sufficiently an arm of the state to qualify for the protection of the Eleventh Amendment.'"[2] *Northeast Federal Credit Union*, 837 F.2d at 534 (quoting *Paul N. Howard Co. v. Puerto Rico Aqueduct Sewer Auth.*, 744 F.2d 880, 886 (1st Cir.1984), *cert. denied* 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985)); *accord Tradigrain*, 701 F.2d at 1132; *Coastal Petroleum Co. v. U.S.S. Agri–Chemicals*, 695 F.2d 1314, 1318 (11th Cir.1983). Krieger questions this analogy. He does not, however, persuasively explain how the inquiries differ or why they should, nor does the one case that he cites explicate the basis for this distinction. *See University of Tennessee v. United States Fidelity & Guaranty Co.*, 670 F.Supp. 1379, 1381 (E.D.Tenn.1987). Moreover, it would be both confusing and inefficient if § 1332's "alter ego" test were to differ from the Eleventh Amendment's. If that were so, a district court determining a particular entity to be independent for purposes of § 1332 would have to make a separate, and distinct, inquiry into whether that entity was independent under the Eleventh Amendment because, if that entity were found to be an arm of the state for purposes of Eleventh Amendment, the court would not have jurisdiction over it regardless of what § 1332 says. In the absence of a clear instruction from Congress, § 1332 should not be interpreted to require such an odd result; the alter ego test under § 1332 should instead be interpreted to conform to the analogous test under the Eleventh Amendment. *See, e.g., NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979); *see generally* Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv.L.Rev. 405, 468, 468–69 (1989).

The Eleventh Amendment's alter ego test is context-specific and requires a case-by-case determination. *See, e.g., United Carolina Bank v. Bd. of Regents*, 665 F.2d 553, 557 (5th Cir.1982) (noting that "each situation must be addressed individually"). In determining whether a state is the real party in interest, our court of appeals has focused primarily upon three factors: the intent of the states creating the entity in question, the structure of the entity and the practical consequences of a judgment against it on the state's treasury, and the control exercised by the state over it. *See Morris v. Washington Metropolitan Area Transit Authority*, 781 F.2d 218, 224–28 (D.C.Cir.1986). The court of appeals also noted that the Supreme Court found the nature of the function performed by the entity to be relevant. *See id.* at 224 (discussing *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979)). Other circuits have considered the entity's corporate powers, such as whether it has been separately incorporated; whether it has the power to sue, be sued, and enter into contracts; and whether its property is immune from state taxation. *See, e.g., Blake v. Kline*, 612 F.2d 718, 722 (3rd Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980).

■ Thus, in determining whether D.C. is the real party in interest in this case, it is necessary to weigh the intent of Congress when it created the Board of Trustees, the corporate powers of the Board, the function performed by the Board, the control exercised over it by D.C., and the practical impact that a judgment against the Board would have upon D.C. Furthermore, in light of the fact that in *Morris v. WMATA* our court of appeals largely ignored the corporate powers of WMATA, that factor should be given less weight than the others. By the same token, our court of appeals focused primarily upon the practical impact of the judgment upon the state's treasury. *See Morris v. WMATA*, 781 F.2d at 223, 225–27. In light of that emphasis, and also keeping in mind that the purpose

**2.** The Eleventh Amendment provides in full: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI.

of the inquiry is to determine the real party in interest, the practical impact of a judgment against the Board should be given the greatest weight of the various factors.

### B.

■ With these principles in mind, it is now necessary to turn to the Board itself.

*Intent of Congress*

Krieger contends that Congress intended the Board to be an independent entity because it described the Board as "an independent agency." D.C.Code § 31–1511(b) (1988). The phrase "independent agency" is, however, at best ambiguous. Although it characterizes the Board as "independent," it also refers to the Board as an "agency." If anything, this description suggests that Congress did not consider whether or not the Board was an arm of the D.C. government.

In the alternative, Krieger contends that there is evidence that D.C. considers the Board to be an independent entity. Specifically, he argues that in *Downs v. District of Columbia*, No. 8776–82 (D.C.Sup.Ct. February 6, 1984),[3] the D.C. Superior Court determined the Board to be an independent agency. This argument is not persuasive. *Downs* addressed a narrow question which Judge Schwelb resolved in a narrow fashion. Judge Schwelb considered whether D.C.Code § 12–309,[4] which requires claimants to notify the Mayor of their claims "within six months after the injury or damage was sustained," applies to claims against the Board of Trustees. He determined that it did not because the Board may be sued under its own name, *see id.* § 31–1511(a), and because

> it would be fundamentally unfair to create a suable entity other than the District of Columbia without including in the

statutory scheme any notice provision as a condition precedent to suit, and then to secure dismissal of a suit against such entity for failure to comply with a provision applicable on its face only to suits against the District.

*Downs* at 498. Judge Schwelb's argument, though compelling, is not based premised upon the assumption that the Board of Trustees is an independent body. It is instead based upon the narrower ground that the Board is a "separate juridical and fiscal entity" with the power to sue and be sued in its own name. *Id.* at 497. Indeed, Judge Schwelb expressly noted that he was not determining "who must pay the bill, irrespective of the formal identities of the named defendants." *Id.* at 498. Therefore, *Downs* cannot be persuasively read to find the Board to be the real party in interests in suits against it. Moreover, even if it were so construed, *Downs* would be a poor indicator of D.C.'s intent because, as *Downs* itself acknowledges, another Superior Court judge reached a different conclusion on the same issue. *See id.* at 497 (discussing *Blassingame v. Bd. of Trustees of the University of the District of Columbia*, No. 6471–82 (D.C.Sup.Ct. July 25, 1983)). The conflict between these cases has not been resolved. *See Downs v. District of Columbia*, No. 87–679 (D.C. February 23, 1989) (dismissing appeal without mention of the jurisdictional issue); *Blassingame v. Board of Trustees*, No. 6471–82 (D.C. September 28, 1983) (dismissing appeal for failure to pay docketing fee).

By contrast, there is some evidence in the Board's enabling statute that Congress considered the Board to be an arm of the D.C. Government. First, the statute subjects the Board to basic municipal procedures such as complying with "District-

---

**3.** *Downs* was reprinted in *The Daily Washington Law Reporter,* March 13, 1984, at 493. A copy of that reprint is attached to plaintiff's supplemental memorandum as exhibit B. All page citations are to that copy.

**4.** Section 12–309 provides in full:

> An action may not be maintained against the District of Columbia for unliquidated dam-

ages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury. A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice under this section. D.C.Code § 12–309 (1989).

wide contracting and procurement rules and regulations," D.C.Code § 31–1516(6), and depositing revenues and receipts with the D.C. Treasurer, albeit in a separate "Municipal University Fund," *see id.* § 31–1516(9). Second, Congress required the Board to operate like a public agency. Specifically, the Board must conduct all of its deliberations, except those involving personnel decisions, in public (*see id.* § 31–1531), it must "make an annual report to the general public" (*id.* § 31–1534), and it must periodically prepare a long-range plan for the University, which must be published at least 60 days prior to its implementation and must also be the subject of such hearings and public forums "as may be necessary to receive public response and comment on such plans" (*id.* § 31–1516(2)(B)).

Although this evidence is far from overwhelming, it is a stronger indication of Congress' intent than the evidence presented by Krieger. This factor must, therefore, be deemed to weigh slightly in favor of treating the Board as an arm of the District of Columbia government.

### Corporate Status and Powers

By contrast, the extensive corporate powers of the Board suggest that it is an independent entity. The Board is a "body corporate" with "perpetual succession." *Id.* § 31–1511(a). It has the power to use a corporate seal, to enter into contracts, to own and sell property, to sue and be sued, and to "enforce such bylaws, rules, and regulations as it may deem necessary for the governance and administration of the University." *Id.* Moreover, the Board's funds are kept in a separate fund, and unexpended balances are carried forward into the next fiscal year. *See id.* § 31–1511(9). All these factors indicate that, at least formally, the Board is independent of the D.C. government.

### Control Exercised by the D.C. Government

In contrast to the Board's formal independence, the District of Columbia government exercises considerable practical control over it. The Mayor, with the advice and consent of the City Council, appoints eleven out of the fifteen members of the Board. *See id.* § 31–1511(c). The Mayor, along with the City Council, also controls the budget of the University. *See id.* § 31–1516(4) (requiring the Board to submit a proposed budget each year to the Mayor and City Council and authorizing the Mayor and City Council to "establish the maximum amount of funds for each of the major components of the total University budget which will be allocated to the Trustees"); *see also id.* § 31–1516(5) (limiting the Board's ability to transfer appropriations between budgeted line items). In light of D.C.'s control over both personnel and the budget, this factor weighs heavily in favor of finding the Board to be an arm of the D.C. government.

### Function of the Board

Similarly, the Board is entrusted with what has traditionally been a public function: coordinating the educational policy and programs of the city. The Board controls all "public institutions of postsecondary education in the District of Columbia" under a "single management system … called the University of the District of Columbia." *Id.* § 31–1515. As a consequence, the Board is charged with coordinating "vocational and technological education, as well as liberal arts, sciences, teacher education, and graduate and post-graduate studies" in the city, *id.* § 31–1501, and developing "a program for public postsecondary education in the District of Columbia" in consultation with the District of Columbia Commission on Postsecondary Education, *id.* § 31–1516(15). In addition, the Board has a duty to "[e]nter into negotiations and binding contracts … to perform organized research, training and demonstrations on a reimbursable basis for the United States and the government of the District of Columbia and other public and private agencies." *Id.* § 31–1516(7). Finally, the Board must operate a law school that admits "students from racial, ethnic, and other population groups that in the past have been underrepresented" in the D.C. bar and that serves "the legal needs of low-income per-

sons ... through the training of law students." *Id.* § 31–1516(2)(C)(ii) & (iii).

Observing that universities in this country have as often as not been run privately, Krieger contends that this factor is neutral. However, as outlined above, the Board is far more than the governing body of a private university. It does not merely administer a single faculty and a single campus. It coordinates many faculties and many campuses, and it is involved in the formulation and implementation of city-wide educational policy. These responsibilities render the Board's function more like that of a county board of education or a state department of education than a private university. The Board's function must, therefore, be deemed to be a public one. *See, e.g., S. Dakota Bd. of Regents v. Hoops,* 624 F.Supp. 1179, 1182 (D.S.D. 1986). Consequently, this factor also indicates that the Board is an arm of the D.C. government.

*Practical Impact of a Judgment Against the Board upon D.C.*

Perhaps most important of all, any judgment against the Board would in effect be paid by the District of Columbia. Based upon a 1977 letter from then-Corporation Counsel John Risher, Krieger contends that any judgment would be paid out of the Municipal University Fund and not the city's general fund. Whatever the validity of this assertion, it is not relevant. As our Court of Appeals stressed in *Morris v. WMATA,* it does not matter from what fund a judgment is, in the first instance, satisfied; the state is the real party in interest if as a practical matter the state must make up the amount paid out through subsequent appropriations. *See, e.g., Morris v. WMATA,* 781 F.2d at 227; *Hall v. Medical College of Ohio,* 742 F.2d 299, 305 (6th Cir.1984), *cert. denied* 469 U.S. 1113, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985). Here, the District of Columbia will ultimately pay any judgment against the Board because UDC is not self-supporting and because the District has committed itself to funding the university. *Cf.* D.C.Code § 31–1533(c) (noting that the Trustees' ability to accept gifts and contributions is not intended to "take

the place of any District or federal appropriations"). Thus, any judgment against the Board would ultimately be paid out of the public treasury, and, therefore, this factor strongly suggests that the Board is an arm of D.C.

*Conclusion*

Once these various factors are balanced, it becomes clear that the Board of Trustees is an arm of the D.C. government. All the factors except the Board's corporate powers suggest that D.C. is the real party in interest. Although the evidence of Congress' intent is weak and the characterization of the Board's function as a public one is not decisive, the practical control exercised by D.C. undermines any inference that may be drawn from the Board's corporate powers that it is in practice an independent entity. More fundamentally, a judgment against the Board would clearly affect the public fisc. Accordingly, D.C. is the real party in interest in this litigation, and the Board of Trustees must be deemed to be an arm of the D.C. government.

### C.

Most courts considering whether public universities are independent entities have reached similar results. *See, e.g., Hall v. Medical College of Ohio,* 742 F.2d at 301–02; *Hughes–Bechtol, Inc. v. West Virginia Bd. of Regents,* 737 F.2d 540; *United Carolina Bank v. Bd. of Regents,* 665 F.2d 553; *Rutledge v. Arizona Bd. of Regents,* 660 F.2d 1345 (9th Cir.1981), *aff'd sub nom. Kush v. Rutledge,* 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983); *Ronwin v. Shapiro,* 657 F.2d 1071, 1072–73 & n. 2 (9th Cir.1981); *Perez v. Rodriguez Bou,* 575 F.2d 21 (1st Cir.1978); *Jagnandan v. Giles,* 538 F.2d 1166 (5th Cir.1976), *cert. denied,* 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1083 (1977); *Brennan v. University of Kansas,* 451 F.2d 1287, 1290 (10th Cir.1971); *Walstad v. University of Minnesota Hospitals,* 442 F.2d 634 (8th Cir.1971).

Despite this impressive array of cases, Krieger contends that this case is controlled by one of the few decisions finding a university to be an independent entity:

*University of Rhode Island v. A.W. Chesterton Co.*, 721 F.Supp. 400 (D.R.I.1989). *URI* is, however, easily distinguished on its facts. In that case, the District Court for the District of Rhode Island stressed the financial independence of the University of Rhode Island. Specifically, it found that the Board of Trustees of the University of Rhode Island has "plenary control" over all money appropriated for it and "may reallocate the funds between the agencies under its jurisdiction." *Id.* at 403. Furthermore, the URI Board is "specifically exempted from certain budgetary constraints and restrictions." *Id.* As discussed above, the Board of Trustees of UDC enjoys no such financial independence: The Mayor and the City Council "establish the maximum amount of funds for each of the major components of the University," D.C.Code § 31–1516(4), the Board's power to transfer funds from one budget item to another is sharply limited, *see id.* § 31–1516(5), and there is no exemption from city budgetary restrictions. Moreover, the *URI* decision expressly incorporated an earlier decision in the District Court for the District of Rhode Island which found that URI was designed to "function independently of state government." *Vanlaarhoven v. Newman*, 564 F.Supp. 145, 149 (D.R.I. 1983). Again, as discussed above, there is no evidence that Congress intended the UDC Board of Trustees to act independently; quite to the contrary, it vested effective control over the Board in the city. Given the UDC Board's limited "economic and operational autarchy," it is likely that the court in *URI v. Chesterton* would have found the Board to be an arm of the District of Columbia. *See URI v. Chesterton*, 721 F.Supp. at 403 (contrasting URI's independence with that of another university found to be an arm of its eponymous state).

More fundamentally, even if the facts in *URI v. Chesterton* were analogous, that case would not control here. First of all, there is an apparent flaw in the court's reasoning. It depends heavily upon the earlier decision in *Vanlaarhoven v. Newman*, but it does not recognize that that decision was, at least in the alternative, based upon a waiver of immunity under the Eleventh Amendment. *See infra* 16 (noting that a waiver of immunity under the Eleventh Amendment does not create jurisdiction under § 1332). Furthermore, the reasoning underlying *URI v. Chesterton* is incompatible with the reasoning of our Court of Appeals in *Morris v. WMATA*. Although it observed that the "Rhode Island General Assembly must appropriate funds for the support and maintenance of the University," the Rhode Island court did not find the State to be the real party in interest. *URI v. Chesterton*, 721 F.Supp. at 402. It reasoned instead that URI was independent because any recovery would go into the University's coffers and not into the state's general fund. *See id.* at 403. In *Morris v. WMATA*, by contrast, our court of appeals ignored the formal source or resting place of the funds and instead looked to whether the state would ultimately be affected by the judgment. *See Morris v. WMATA*, 781 F.2d at 225–27. Because our court of appeals, applying this reasoning, would likely have found the University of Rhode Island to be an arm of the state, *URI v. Chesterton* is not persuasive authority in this circuit.

### D.

Krieger also contends that D.C., by allowing suits against the Board, *see* D.C.Code § 31–1511(a), waived its sovereign immunity. It is, however, well-settled that waivers of sovereign immunity are to be narrowly construed. *See, e.g., Lehman v. Nakshian*, 453 U.S. 156, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981). As a consequence, any waiver of the Board's sovereign immunity against suit in D.C. courts should not, without a more definite indication, be construed to waiver sovereign immunity against suit in federal court. *See, e.g., Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662 (1974); *United Carolina Bank v. Bd. of Regents*, 665 F.2d at 559. More fundamentally, because an alter ego of a state is not a citizen of that state whether or not sovereign immunity has been waived, a state's waiver cannot create diversity jurisdiction. *See*

*Highway Commission v. Utah Const. Co.,* 278 U.S. at 199–200, 49 S.Ct. at 105–106.

#### E.

In conclusion, because the Board is an arm of the District of Columbia government and because Krieger cannot establish jurisdiction over an arm of the District of Columbia through pendant party jurisdiction, *see Long v. District of Columbia,* 820 F.2d at 416, Krieger's claims against the Board must be dismissed. Accordingly, the accompanying order will grant the Board of Trustees' motion to dismiss and dismiss the claims against it.

#### II.

 Trane also moves to dismiss the claims against itself. In its original papers, Trane argued that if the District of Columbia were dismissed from this action the whole case would have to be dismissed. It is, however, well-settled that "so long as a ... party is not indispensable to the action, a district court may dismiss only the claim against that party and retain jurisdiction over the rest of the case." *Id.* at 416. Because it is equally well-settled that joint tortfeasors are not indispensable parties, *see, e.g.,* 7 C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1623, at 342 & n. 2 (2d ed. 1986), Krieger may proceed against Trane even though his claims against the District and against the Board have been dismissed.

Trane also contends that this action should be dismissed in favor of a pending parallel state action. It points out that this case involves only issues of state law, that Krieger will suffer no prejudice or disadvantage from having his claims adjudicated across the street in Superior Court, that the state action was filed at the same time as the instant complaint, and that the state action is more comprehensive because the Superior Court has jurisdiction over the Board. It is not clear that these factors constitute the sort of " 'extraordinary and narrow exception[s] to the duty of a District Court to adjudicate a controversy properly before it' " that would justify dismissal of an action based upon considera-

tions of wise judicial administration. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1062–63, 3 L.Ed.2d 1163 (1959)). Although the factors cited by Trane indicate that on balance it would be more efficient to conduct these proceedings in state court, the Supreme Court has stressed that "the balance [is] heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Memorial Hospital Corp. v. Mercury Const.,* 460 U.S. 1, 16, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983).

It is not, however, necessary to resolve this issue. Krieger has represented to the Court that he filed parallel complaints "[d]ue to some uncertainty ... regarding the legal question of whether the District was subject to this Court's diversity jurisdiction" and that he "has no intention of proceeding with two identical law suits in two separate courts." Plaintiff's Supplemental Memorandum at 10–11. Based upon that representation, the accompanying order will dismiss plaintiff's claims against Trane and deny Trane's motion to dismiss as moot.